UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 16-cv-22037-KMW

ANA GARCIA,

     Plaintiff,

vs.

ALS EDUCATION, INC.
d/b/a ACCELERATED LEARNING SOLUTIONS,

     Defendant.
_____/

## ORDER

**THIS MATTER** is before the Court on Defendant ALS Education, Inc.'s ("ALS")

motion for summary judgment. (DE 61; Statement of material facts, DE 62). Plaintiff

Ana Garcia responded to the motion (DE 65; Responsive facts, DE 64[1]) and ALS filed a

reply in support of the motion (DE 69). For the reasons below, the motion (DE 61) is

**GRANTED.**

## I.    BACKGROUND[2]

This case is a wage dispute. Garcia was an employee at ALS, a for-profit

corporation that operates charter schools in Florida and other states, from July 2014

---

[1] Despite claiming that the Local Rules provided insufficient time to allow a full response to ALS's motion, Garcia's responsive facts exceeded the ten-page limit provided by Local Rule 56.1(a). Nevertheless, the Court considers these additional facts here.

[2] This section sets forth the relevant admitted facts for purposes of summary judgment. In their respective statements of material facts, the Parties have provided various assertions that are supported by the record. In some instances, the Parties have not contested their adversary's assertions. In other instances, the Parties have contested their adversary's assertions but without citing sufficient materials in the record to refute those assertions. The Court will deem all of these uncontested—or insufficiently contested—factual assertions to be admitted. *See* S.D. Fla. L.R. 56.1(b); Fed. R. Civ. P. 56(c), (e).

until her termination in March 2016. (DE 62 ¶ 1). She seeks overtime wages pursuant to the Fair Labor Standards Act ("FLSA"). ALS moves for summary judgment, arguing that it never owed Garcia overtime because her employment fell under various FLSA exemptions. Consequently, the material facts discussed here relate to the nature of Garcia's employment at ALS.

Garcia's professional and educational backgrounds reveal significant experience in her field. She holds a Bachelor's of Science degree in professional administration and a Master's of Science degree in educational leadership from Barry University. (DE 62 ¶ 3). She also holds certifications from the Florida Department of Education in educational leadership and as a classroom English teacher. (DE 62 ¶¶ 4-5). Before working at ALS, she held various positions during ten years at Miami-Dade County Public Schools ("MDCPS"), including middle school teacher, reading coach, curriculum support specialist, and—in her last year at the system—middle school Language Arts Department Chair. (DE 62 ¶¶ 6-9).

While working in her final role at MDCPS, a former colleague informed Garcia about an open "Director of Accountability and Assessment"[3] position at ALS. (Ana Garcia Deposition Vol. I, DE 59-3 at 47-48). Although Garcia did not know exactly what responsibilities this job would entail, she assumed that she would have roughly the same duties as the person at MDCPS with a similar title: evaluating, interpreting, and analyzing available information to create and propose policies and procedures to help schools meet Florida state testing expectations and accountability standards. (DE 59-3

_____

[3] ALS interchangeably referred to Garcia's position as "Director of Accountability and Assessment" and "Director, Accountability and Data Analysis." (DE 60-5 at 2).

at 51-52). Garcia believed she was qualified and submitted an application that highlighted her "*extensive experience translating policy and legislat[ion] in order to be compliant with law and regulations affecting school accountability and curriculum.*" (DE 62 ¶¶ 12-13; DE 64 ¶¶ 12-13; Applicant Statement, DE 59-5 at 5). Her application was successful. (Acceptance Letter, DE 59-5 at 6-7).

Garcia began working as ALS's Director of Accountability and Assessment in July 2014 at an annual salary of $85,000. (DE 62 ¶ 14). She worked both at ALS's charter schools and from "*home, especially after getting home from schools. It's when my real work started because mostly if I was working alongside an assistant principal, it was to assist them. And when I got home, began my work.*" (Ana Garcia Deposition Vol. II, DE 59-4 at 7). To inform ALS of her whereabouts, Garcia would submit a weekly calendar to her supervisor at the time, Angela Whitford-Narine. (Ana Garcia Declaration, DE 64-1 ¶ 5). She would also occasionally receive requests from secretarial staff to record "*work locations and approximate hours.*" (DE 64-1 ¶ 5).

Whitford-Narine, who was ALS's Florida Regional Director at the time, is now ALS's President and served as ALS's corporate representative in this litigation. She testified that ALS expects salaried employees to work as much as needed to fulfill their delineated responsibilities:

> "[S]alaried employees . . . [had] the flexibility. If somebody starts later, they may work later. If somebody is working on a project that they need to complete or they're working to complete, they may work later. . . . It's a known thing that as a salaried employee, we are expected to do what we need to do to complete our job responsibilities."

3

(Angela Whitford-Narine Deposition, DE 59-1 at 67-68). Consistent with these expectations, Whitford-Narine said Garcia "had flexibility in her scheduling" and "certainly did not have [to] report[] every task she was doing at all times during the day." (DE 59-1 at 32). Whitford-Narine stated Garcia was expected to use her own professional judgment in budgeting her time. (DE 59-1 at 88-89). The record does not contain evidence establishing that Garcia worked shifts or that ALS ordered Garcia to work specific hours.

The record also shows that Garcia's primary role at ALS was to use her experience and expertise to advise ALS colleagues on a variety of topics related to the measurement of student and teacher performance at ALS schools. Garcia minimizes these responsibilities and claims that she was a "highly paid secretary." (DE 65 at 14). During Garcia's first month, Whitford-Narine emailed her a list of duties prepared by Garcia's predecessor as Director of Accountability and Assessments at ALS, Jim Madgey. (DE 64-1 ¶ 11; DE 59-1 at 60). Although Garcia offers no record citation for this email, she claims that Madgey trained her to perform the tasks it listed, which she characterizes as manual labor such as "[c]ollecting pdfs for [End of Course Assessments], [Florida Comprehensive Assessment Test], annual accountability report, charter reports, getting Pearson passwords, parent and student surveys, principal bonuses, [and] teacher evaluation." (DE 59-3 at 86).

Garcia does not dispute, however, that two to four months into her tenure, Whitford-Narine sent her a formal written job description. (DE 59-3 at 86-88; Job

4

Description, DE 59-5 at 10-11). This document unambiguously provided in the header: "FLSA Status: Exempt." (DE 59-5 at 10).[4] It also described Garcia's position in detail:

> The Director of Accountability and Data Analysis is responsible for researching, retrieving, analyzing, and monitoring data related to accountability measures required by district contracts, charter applications, and management agreements, with particular regard to local, state, and federal policies and regulations. The purpose of this position is to coach operational leadership teams and school staff members to understand state, contractual, and internal performance metrics and how their respective schools are performing on those metrics. The Director of Accountability and Data Analysis will play a lead role in identifying appropriate performance accountability metrics and goals for future applications, contracts, and legislative initiatives and may be called upon to communicate performance data to a variety of stakeholders.

(DE 59-5 at 10). The same document listed Garcia's specific duties reflecting this position description, such as: researching applicable accountability standards; advising others on how these standards are applied within ALS and in ALS documents and agreements; developing and delivering professional development modules to ALS staff; collaborating with and advising ALS's school administrators on school and student performance metrics; reconciling available public data with ALS's internal data; and performing other duties assigned by the company. (DE 59-5 at 10-11).

Garcia did not have any issues with the written job description at first but testified that months (almost a year into her tenure) after receiving it she realized that "when I compared my primary duties from what I was trained to do and asked to do to what was listed on [the formal job description], I noticed they did not match whatsoever." (DE 59-

---

[4] Garcia now claims that she always knew she had been misclassified as an FLSA-exempt employee, but never communicated this belief to Whitford-Narine because she "wanted to make [her job] work." (DE 59-4 at 28). Furthermore, she never gave Whitford-Narine a breakdown of how many overtime hours she had worked because she figured Whitford-Narine "was aware of the hours that I was working overtime because she was right along with me." (DE 59-4 at 25).

3 at 89).  She told Whitford-Narine about this discrepancy but claims Whitford-Narine asked her to disregard the formal job description and instead perform only the tasks assigned when Garcia first started.  (DE 59-3 at 88-91).[5]

During the same series of conversations, Garcia asked Whitford-Narine for a raise.  (DE 59-4 at 20-21; DE 59-1 at 78-79).  Garcia and Whitford-Narine have different recollections about the basis for this request.  Garcia claims she asked for a raise because she was dissatisfied with her actual duties compared to the duties in her job description.  (DE 59-3 at 88-91).  She also claims to have told Whitford-Narine that she was working "excessive hours" on "night[s], weekends, consecutively."  (DE 59-4 at 21-22).  Whitford-Narine recalls that Garcia presented a more positive rationale for the raise request:

> [S]he felt that she—her role was more important than what it was being compensated for; that she [was] aware of the salaries of principals [at ALS charter schools]; that she felt her role was as important, if not more important, than a principal position, and she felt that she deserved at least as much as these particular principals whom she was apparently aware of their salary.

(DE 59-1 at 78-79).  Whitford-Narine eventually denied Garcia's request for a raise and told Garcia to take the issue to David Zeiler, who would be starting in July 2015 as ALS's Executive Director of Curriculum and who would be taking over as Garcia's supervisor after ALS's corporate reorganization.  (DE 59-4 at 21; DE 59-1 at 31; Ana Garcia Performance Review Log, DE 59-5 at 70).

---

[5] Garcia's personnel file indicates that in May 2015, she met with Whitford-Narine to discuss "job responsibilities, commensurate salary, bonus, evaluation, vision for assessment and accountability department" and then followed up in June 2015 with an email that "presented [a] revised job description and responsibilities in an accountability and assessment binder."  (Ana Garcia Performance Review Log, DE 59-5 at 70).

After Zeiler started at ALS, Garcia asked him for a raise as well. She told him about what she perceived as the discrepancy between her duties and the job description and "the consumption of time to process the manual work," and, in turn, "asked him . . . for remuneration for the excessive hours and the job description discrepancy." (DE 59-4 at 21). She also "showed Zeiler my accountability binder[6] to illustrate my responsibilities as given to me by Jim Madgey" but claims that Zeiler "became defensive and stated that he had someone in Pittsburg[h] that can triple my work load for less money." (DE 64-1 ¶ 10). She claims that in response to her complaints, Zeiler concocted negative performance reviews and assigned her only menial tasks until her termination in March 2016.

Nevertheless, Garcia's own testimony and the record establish that her actual role—both before and after Zeiler became her supervisor—was largely consistent with ALS's formal job description and required her to work independently on complex tasks. For example, Garcia stated she was competent to research state and federal education accountability standards and actually did so for ALS:

> COUNSEL:  So can you research federal accountability standards?
>
> GARCIA:  I was trained how to read them, yes, in Dade County.
>
> COUNSEL:  Okay.
>
> GARCIA:  And state. State, we're in Florida, so, yes. Local, I don't know local, but can I research? Yes, I can research.

(DE 59-3 at 98).

> COUNSEL:  So how do you get possession of that information?

---

[6] Neither Party cites, nor is the Court able to locate, the "accountability binder."

GARCIA:    We go into the website and download the document.

COUNSEL:  And you did that?

GARCIA:    I did that.

COUNSEL:  For ALS?

GARCIA:    Yes.

(DE 59-3 at 102). Further demonstrating her aptitude for collecting and analyzing data as part of her research role, on one occasion in September 2015, Garcia spent "all night" pulling together disparate documents and correlating them to teaching strategies to advise other ALS personnel in preparation for a compliance visit at an ALS charter school. (DE 59-4 at 74-75).

Indeed, the record shows that Garcia's role regularly called for her to use her existing knowledge to provide considered input on how ALS should measure its school and teacher performance. In one illustration of this role, Whitford-Narine asked for Garcia's help finding alternative ways to measure school performance:

COUNSEL:    For any reason, did anyone ask you to make recommendations about accountability standards language for any reason?

. . .

GARCIA: Angela wanted to look at how, I guess, things were done . . . very generally, she always wanted to look for alternative ways of looking at the performance of the schools.

(DE 59-3 at 113-14). Garcia knew Whitford-Narine expected her to help obtain "more favorable outcomes for the results generating from the metrics collected . . . to argue

that the [ALS] schools were helping the students." (DE 64 ¶ 34).[7] Likewise, in an email dated May 1, 2015, Whitford-Narine asked Garcia "what . . . we need to do here" with regard to how a proposed Florida law would alter the relevant performance evaluation criteria for ALS charter schools. (Email correspondence regarding House Bill 7069, DE 59-5 at 31-32). Garcia responded to Whitford-Narine with an email containing "Talking Points" regarding the new legislation's impacts. (DE 59-5 at 32).[8] Two months later, in an email dated July 4, 2015, Whitford-Narine asked Garcia and an outside consultant, Mark Warren, to review the performance section of a charter school application. (DE 62 ¶ 49). Soon after that, on July 28, 2015, Garcia sent an email to Whitford-Narine attaching a "data analysis plan" that she had put together. (Email correspondence regarding data analysis plan, DE 59-5 at 37; DE 59-4 at 61). And on August 10, 2015, ALS's Executive Director of Operations, Michael Anna, corresponded with Garcia regarding how to weight certain criteria in measuring the progress of ALS's teaching staff, referencing a conversation in which Garcia had provided Anna with more detailed

---

[7] Garcia acknowledges that Whitford-Narine asked her to think of evaluation metrics that would cast ALS schools in a more favorable light, but contests this material fact by noting that other ALS employees ultimately generated the actual statistics Whitford-Narine requested. (DE 64 ¶ 34). There is a pattern of this type of objection: ALS cites evidence that Garcia performed a professional task requiring her experience and independent judgment, and Garcia responds that someone else created the final product, that someone else generated information she simply passed along, or that anyone could have performed the task she did. (See DE 64 ¶¶ 19, 26-27, 30, 32, 34-50, 54-56, 59-75, 80-82, 87-88). These responses fail to adequately dispute that Garcia performed the tasks in question.

[8] Garcia objects that her "Talking Points" came "from the [Florida Department of Education] that emails updates." (DE 59-4 at 53-54; see also DE 64 ¶ 47). Garcia's citation to the source on which she relied does not rebut the facts that she knew where to look, researched the answer to Whitford-Narine's question, and replied after finding responsive information.

instruction on the issue. (Email correspondence regarding pay for performance, DE 59-5 at 39; DE 59-4 at 63-64).[9] All of these discussions show that ALS expected Garcia to use her experience in the education field in executing her job duties.

Another of Garcia's duties was to help develop ALS's Teacher Evaluation System and Leadership Evaluation System ("TES/LES") scoring system for its Florida teachers. Garcia claims that she only "changed . . . number[s] in the spreadsheet" and "did not have the experience" to know how to weight individual TES/LES components. (DE 64 ¶ 37). She also claims that the "actual components and percentages" for the TES/LES system were "designated by the state." (DE 64 ¶ 38). Nevertheless, she admits using her knowledge to download relevant information from disparate sources, enter data into a TES/LES "calculating spreadsheet," and alter the weighting of relevant criteria based on the requirements of Florida legislation. (DE 64 ¶ 37).[10] She also offered her own judgment on the proper way to calculate the TES/LES scores. (Email correspondence regarding House Bill 7069, DE 59-5 at 50). Confirming the view that Garcia became well versed in the details of ALS's Florida TES/LES, she later helped compile documents to assist the development of ALS's North Carolina TES/LES

_____

[9] Although Garcia asserts that any layperson could have responded to Anna's correspondence, she admits that she only knew how to answer Anna because she was aware of and read "correspondences" regarding pertinent Florida law. (DE 59-4 at 64-65; DE 64 ¶¶ 61-62).

[10] In describing the TES/LES project, Garcia claims that "clearly all the work was done by" an outside consultant named Mark Warren—while simultaneously admitting that she performed several relevant tasks and acknowledging that Warren sent emails to other ALS employees stating that he and Garcia were working on the project together. (DE 64 ¶ 37). Garcia dismisses Warren's emails evidencing her work by stating that Warren "was a gentlem[a]n . . . and up talked me." (DE 64 ¶ 37).

framework.  (DE 62 ¶ 60; DE 64 ¶ 60; North Carolina's Growth Model presentation, DE 60-1 at 42-50).

ALS also had Garcia advise and train other employees in her areas of expertise. For example, on July 23, 2014, after she had "just started with the company," Garcia gathered and "passed along . . . information from the state/district" (DE 64 ¶ 40) in a presentation with Whitford-Narine and two others titled "Performance Metrics-Tracking, Interpreting, Intervening, and Reporting."  (ALS Summer Leadership Conference July 23, 2014 schedule, DE 60-4 at 9).  On September 5 and September 8, 2014, Garcia trained ALS employees on Florida's Fall 2014 End of Course Assessments using procedures developed by the testing software company Pearson.  (Elizabeth Chardon Declaration, DE 60-2 ¶ 13; Email correspondence regarding 2014 Fall EOC Procedures, DE 60-2 at 6-7; DE 64 ¶ 41).  On March 24, 2015, Garcia sent Whitford-Narine an email attaching a document titled "Spring Accountability training activities with notes" (Spring Accountability Workshop presentation, DE 60-3 at 5), which Garcia described as a presentation of "a list of tasks that [ALS's assistant principals] follow to execute the testing guidelines in the manual from the testing software company."  (DE 64 ¶ 46).  Finally, on July 22, 2015, Garcia "demonstrated the tools that are available on the state website" (DE 64 ¶ 50) as part of a training session for ALS employees titled "Planning for 2015-2016: School Improvement Plans."  (ALS Summer Leadership Conference July 22, 2015 Schedule, DE 60-1 at 8).

Garcia's job responsibilities also included assisting ALS charter schools in preparing "School Improvement Plans" ("SIPs") for submission to local public school

11

districts.  (DE 62 ¶¶ 52-53; DE 64 ¶ 52-53).  ALS states Garcia "took the lead" in developing SIPs for all three of ALS's charter schools in Miami-Dade and Broward counties.  (DE 62 ¶ 54).  Although Garcia testified at her deposition that she took "the State template for a school improvement plan and . . . put it into a Word document and gave it to the schools," (DE 59-4 at 69), she stated in her response to summary judgment that she was responsible for "providing the schools with the template and showing them where to obtain tools" on ALS's internal system to complete the SIPs.  (DE 62 ¶ 54).  She also acknowledges that she prepared ALS's August 2015 School Improvement Planning Guide by incorporating information from several external sources and obtaining input from various ALS employees.  (DE 62 ¶ 56; DE 64 ¶ 56; *see also* School Improvement Planning Guide, DE 60-1 at 12-31).  And in September 2015, Garcia worked with ALS schools to ensure their SIPs were "completed" and proofread.  (DE 64 ¶ 65).

Finally, ALS allowed Garcia to sign contracts on its behalf with the testing company ACT.  For example, on June 1, 2015, Garcia was ALS's representative and signatory to a "Licensing and Service Agreement" with the testing company ACT regarding ALS's administration of the September 29, 2015, ACT test at 24 schools.  (ALS-ACT License and Services Agreement, DE 60-3 at 39).  Garcia signed a similar agreement in relation to the March 15, 2016, and April 19, 2016, ACT test at 24 schools.  (ALS-ACT License and Services Agreement, DE 60-3 at 40).[11]

---

[11] Garcia objects to this version of events, stating that Whitford-Narine "told Plaintiff to sign the ACT" and "[p]ermission was requested to finance," but these responses do not rebut the fact that Garcia signed the contracts and bound ALS as a result.  Moreover,

In response to ALS's motion for summary judgment, Garcia submitted a declaration—in direct opposition to her earlier deposition testimony, the testimony of former colleagues, and the emails and documents cited above—that she "did not use my own judgment for **any** tasks" and that "**[a]ll** items that I worked on and information that was disseminated by districts or states, was guided by or scripted" by superiors. (DE 64-1 ¶ 18) (emphasis added).[12]  Garcia's declaration also states, more modestly, that her primary role was manual labor in the form of "keying in information from one place to another place." (DE 59-4 at 34).

However, when Zeiler started at ALS, he met with Garcia to "discuss strengths and weaknesses of Accountability and Assessment." (DE 59-5 at 70).  He testified that "early on, Ana was providing the guidance as I—again, I was new to the role, and I didn't have an understanding.  I relied on her as the director of assessment and accountability." (David Zeiler Deposition, DE 59-2 at 24).  Zeiler considered "Garcia to be [ALS's] expert in anything relating to accountability and assessment, including measuring and testing of the learning potential and achievement of students." (David

---

Garcia confusingly claims—contrary to her signature on the contracts—that she "was not allowed to sign anything." (DE 64 ¶ 48).

[12] The Court disregards this statement in Garcia's declaration.  Where an affidavit, "without explanation . . . flatly contradicts . . . prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously," courts in the Eleventh Circuit may disregard such self-serving statements as a matter of law.  *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016).  Nevertheless, because the Eleventh Circuit has made clear that the rule permitting courts to disregard affidavits "operates in a limited manner to exclude unexplained discrepancies and inconsistencies," the Court considers Garcia's other, more constrained declaration statements that do not flatly contradict other evidence in deciding ALS's motion for summary judgment.  *See id.*

Zeiler Declaration, DE 60-1 ¶ 5). Two other ALS employees, Elizabeth Chardon[13] and Arany Fogler, corroborated Zeiler's statement that Garcia was ALS's point person on "anything related to accountability and assessment." (DE 60-2 ¶ 8; Arany Fogler Declaration, DE 60-4 ¶ 7).

To be sure, Garcia did not work on her projects in isolation or without supervision. But the fact that she cooperated with or received guidance from others did not preclude her from exercising independent judgment in several aspects of her job. Zeiler testified that Garcia received assistance from external consultants on some of her projects, but not others. (DE 59-2 at 37). On one occasion, Garcia formulated a proposal to obtain assistance from a consultancy firm to help integrate and display data within ALS's technology systems and received ALS's approval to proceed with the project. (DE 59-2 at 16-17). On other occasions, members of ALS's team would step in to help Garcia on her projects. For example, Garcia once became ill, and Zeiler had to review a "very complex spreadsheet that Ana put together that pulls attendance data for schools . . . [and] grade in from teachers" in connection with a project for Hillsborough County, Florida. (DE 59-2 at 26-28). Finally, although Garcia ranked below Zeiler in ALS's hierarchy, she was able to share concerns with Zeiler's superiors; she once went directly to Zeiler's supervisor, Whitford-Narine, with a disagreement about Zeiler's proposed methodology for measuring ALS employees' effectiveness within state-issued guidelines. (DE 59-2 at 34-36).

[13] In challenging Chardon's statement, Garcia asserts that although she knew Chardon from their shared time in the MDCPS before they both began working at ALS, there was "limited communication" and Chardon would "frequently request proofreading and assistance with work unrelated to my job and responsibilities." (DE 64 ¶ 20).

Moreover, although Garcia believed that ALS and Zeiler mistreated her, the specific bases for her dissatisfaction are not material to this wage dispute and her general complaints do not create a triable issue as to the nature of her duties.[14]  In fact, the evidence confirms that Garcia's role remained largely unchanged after Zeiler joined ALS.  The month after Zeiler started, he had all his direct reports "create their list of projects that they felt were—fell under their responsibility, and we went through those projects in a meeting, and we agree on a timeline."  (DE 59-2 at 12).  His employees, including Garcia, "would keep track of their projects on the project hub, and then we—I would monitor the project hub to see where they were with completion."  (DE 59-2 at 12).  In weekly team meetings, the employees "would report on the status of their projects."  (DE 59-2 at 12).  Garcia's projects included her work with the SIPs, for which Zeiler testified that she "created the documents to walk or train the principals on how to

---

[14]  Garcia complains that Zeiler "did not consider me an expert" and, instead, "understood that I was able to compile information relatively quickly" and used her as a data entry technician.  (DE 64-1 ¶ 6).  She claims that Zeiler used an "assessment plan" document he brought from his previous employer and "designated the data points to be filled out by operations staff members including me."  (DE 64-1 ¶ 6).  She argues that "[o]ther data points already were designed and implemented in ALS prior to my onboarding" and that the consultant Mark Warren "calculated and conducted the analysis of all marketing and compliance/contracts metrics."  (DE 64-1 ¶ 6).  She states Zeiler dismissed her request for more pay and her complaints that her actual job did not match her job description.  (DE 64 ¶ 21).  She asserts that Zeiler treated her unfairly and disparaged her to Whitford-Narine after she requested a raise and told her that "he had many people that would be able to do the work I did, and that the person he knew of in Pittsburg, did three times the volume of work as Agora had schools in more states and for less amount of money."  (DE 64-1 ¶ 6).  She states that after an unsuccessful compliance visit at a Miami ALS school, Zeiler unjustifiably "sent an email to me stating that I should have never sent" a PowerPoint presentation to the principal at the school in advance of the visit.  (DE 64-1 ¶ 7).  Finally, she claims that Zeiler evaluated her using performance metrics he imported from his previous job at Agora and "continuously sent emails discrediting all the work turned in and increasing the volume, assigning new tasks and giving impossible deadlines."  (DE 64-1 ¶ 8).

fill out a template she created by using a collection of a variety of different school improvement planning guides." (DE 59-2 at 21; *see also* DE 60-1 ¶¶ 7-8, DE 60-1 at 11-40).  Garcia also put together the "assessment plans" for which Zeiler provided the template he used with his previous employer, Agora, "as a sample or a reference"—while expecting her to bring "her expertise" to bear as he was not familiar with Florida's assessments framework at the time.  (DE 59-2 at 22; DE 59-5 at 71).

Eventually, in March 2016, ALS terminated Garcia.  (DE 59-4 at 114).  Further evidencing the nature of Garcia's role, Zeiler explained that he and the company faced significant consequences after she left:

> It impacted us, to be honest with you. If you look at -- she was responsible for working with all the schools to do corrections during the spring corrections. And if you look at some of our schools, some of our schools had incompletes because we were not able to do the corrections during that time period. So it was difficult.

(DE 59-2 at 39).  The undisputed evidence demonstrates that Garcia's role regularly required the use of judgment and experience to help ALS understand and comply with the metrics that authorities used to measure student and school performance.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III.    DISCUSSION

"The FLSA was enacted in 1938 to aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875, 876–77 (11th Cir. 2010) (quotation marks and citations omitted).    The Act "requires employers to pay covered employees at an overtime rate if they work more than 40 hours in a workweek." *Adams v. BSI Mgmt. Sys. Am., Inc.*, 523 F. App'x 658, 660 (11th Cir. 2013) (citing 29 U.S.C. § 207(a)(1)). "There are, however, exemptions from the overtime pay requirement, which depend on the type of work performed by the employee.  'Any employee employed in a bona fide . . . administrative, or professional capacity need not receive overtime compensation in accordance with the requirements of 29 U.S.C. § 207(a).'" *Calvo v. B & R Supermarket, Inc.*, 63 F. Supp. 3d 1369, 1378 (S.D. Fla. 2014) (quoting *Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1298 (S.D. Fla. 2006)).

Congress did not delineate the contours of these exceptions, but instead "expressly authorized the Secretary of Labor to define the scope of the . . . administrative, and professional employee exemptions [in § 213(a)(1)]." *Avery v. City of Talladega*, 24 F.3d 1337, 1340 (11th Cir. 1994) (citation omitted).  "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).  "The employer bears the burden of proving an exemption applies, and [courts] construe FLSA exemptions narrowly." *Adams*, 523 F.

App'x at 660 (citing *Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1212 (11th Cir. 2011)).

ALS argues for summary judgment because Garcia's employment was exempt from the overtime provision of the FLSA under the administrative and learned professional exemptions.[15]  Because no reasonable jury could conclude on this record that ALS employed Garcia in anything other than an administrative or professional capacity, there is no genuine dispute of material fact and ALS is entitled to summary judgment.  Below, the Court separately addresses why each exemption applies.

A.    **Administrative Exemption**

"Employees who are 'employed in a bona fide . . . administrative . . . capacity' are exempt from the overtime-pay requirement" of the FLSA.  *Adams*, 523 F. App'x at 660 (citing 29 U.S.C. § 213(a)(1)).  Courts determine whether this administrative exemption applies using a three-pronged test: (1) the employee is paid a salary above $455[16] per week; (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) this "primary duty includes the exercise of discretion

---

[15] ALS also argues that Garcia was exempt under the specific exemption for educational institutions, but the Court need not consider the applicability of this exemption in light of the clear applicability of the administrative and learned professional exemptions.

[16] On May 23, 2016, the Department of Labor announced a final rule that would have raised the $455 weekly salary threshold.  81 Fed. Reg. 32549.  The final rule was supposed to become effective on December 1, 2016, but on November 22, 2016, a federal district court enjoined its implementation.  *See State of Nev. v. United States Dept. of Labor*, Case No. 16-cv-00731-ALM (E.D. Tex. Nov. 22, 2016).  That injunction barring implementation remains effective as the Department of Labor appeals the district court's decision to the Fifth Circuit Court of Appeals.

and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). Garcia's $85,000 annual salary clears the first prong. 29 C.F.R. §§ 541.300(a)(1). Accordingly, the applicability of the exemption rests on the second and third prong.

As to the second prong of the exemption, "[a]n employee's 'primary duty' is determined based on the character of the job as a whole and with reference to all relevant facts." *Levy v. Remy Cointreau USA, Inc.*, No. 14-CV-20906-UU, 2014 WL 11369633, at *4 (S.D. Fla. Nov. 6, 2014), *aff'd,* 604 F. App'x 918 (11th Cir. 2015). Relevant facts may include:

> The relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). As to the "management or general business operations" aspect of the second prong:

> The phrase . . . refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment. . .
>
> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . research; . . . government relations; . . . legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

29 C.F.R. § 541.201(a), (b).

The third prong of the administrative exemption test "looks to whether the employee's primary duties involve 'the exercise of discretion and independent judgment with respect to matters of significance.'" *Rock*, 380 F. App'x at 879 (quoting 29 C.F.R. § 541.200(a)(3)). "Some of the factors to consider when determining whether an employee exercises discretion and independent judgment are 'whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business' and 'whether the employee provides consultation or expert advice to management.'" *Viola v. Comprehensive Health Mgmt., Inc.*, 441 F. App'x 660, 663 (11th Cir. 2011) (quoting 29 CFR § 541.202(b)).

The record in this case establishes that Garcia's employment satisfied the second and third elements of the administrative exemption test and that Garcia was not a "data entry technician" or a "highly paid secretary" as she now claims. The evidence shows Garcia's primary duty was to advise ALS, its employees, and its management on topics related to the measurement of student and teacher performance at ALS schools. This role, which was critical to the organization because it contributed to the success of the charter schools that are ALS's business, required Garcia to research, be knowledgeable about, and help the company comply with applicable performance standards established by legislatures and governmental authorities. She did so, as evidenced by emails she wrote, documents she authored, and deposition testimony that she and others gave. Further, her job description contained a listing of these high-level duties and—although the notation alone is not dispositive—an express disclosure that

21

ALS considered the position to be FLSA-exempt.  In light of all these considerations, Garcia's role fell under the administrative exemption.

In rebuttal, Garcia offers no competent explanation or evidence on which a reasonable factfinder could adopt her theory that her role was secretarial.  Instead, she attempts to minimize the work she did.  She maintains that although she is "well-educated and well-qualified for the job she thought she was being hired for" she "never actually worked that job . . . [and] spent hours and hours performing basic tasks like information gathering and data entry while all of the high-level analysis and assessment was done by either outside consultants or other employees."  (DE 65 at 2).   To Garcia, her role consisted—particularly after Zeiler became her supervisor—of "little more than gather[ing] information and submit[ting] it to some other resource which performed the actual analysis and processing. Plaintiff did not make decision[s] or bind the company on any matter of significance—at least unless she was instructed to do so by some other authority."  (DE 65 at 14).

But Garcia's argument does not address the ample evidence, including her own testimony and documents, revealing the actual nature of the duties she performed.  The record contains conclusive evidence that Garcia's job regularly required her to apply her expertise in school and student performance metrics to find and present pertinent information to ALS employees and help ALS fulfill complex objectives.  For instance, supervisors and other ALS personnel regularly requested and received Garcia's views on the appropriate criteria for measuring student and school performance.  Further, Garcia trained ALS employees on these criteria, created a "data analysis" plan, helped

develop ALS's TES/LES system for Florida and later North Carolina, wrote ALS's School Improvement Plan planning guide, and signed contracts with the testing company ACT on ALS's behalf. Even if the focus of Garcia's role was to "gather information and submit it" as she argues, she was operating in the complex environment of state and local accountability and performance standards. Thus, determining which information was relevant—and which resources to use in translating that information for other employees ALS—was not a secretarial task and required experience, discretion, and independent judgment. No reasonable trier of fact could find on this record that Garcia's research and analytical duties were manual in nature or wholly and exclusively reliant on instruction from superiors.

Moreover, there is no reasonable basis to conclude that Garcia's role materially changed after Zeiler became her supervisor. Although Garcia cites several ways in which Zeiler was unfair to her, these complaints do not dispute any of the factual bases ALS advances to assert that Garcia's role continued to require expertise and independent judgment: she trained Zeiler at the ALS Summer Leadership Conference in July 2015, had extensive knowledge of Florida educational assessment and accountability standards, was the company's point person on these matters, and worked on a variety of intensive projects. Although Garcia makes much of the template data assessment plan that Zeiler brought from his previous employer Agora, she presents no competent evidence showing that the nature of her role changed significantly after Zeiler provided her that template. To the contrary, the record contains

ample evidence showing that Garcia continued performing complex and intellectually demanding tasks even after ALS hired Zeiler in July 2015.

Persuasive authority confirms that, in these circumstances, summary judgment for the employer on the administrative exemption is appropriate. In *Levy*, another court in this District considered an FLSA overtime claim raised by a "brand ambassador" for an alcoholic beverage company who was "tasked with promoting Louis XIII cognac with businesses and high net worth individuals in his market." *Levy*, 2014 WL 11369633, at *1. At summary judgment, Levy characterized himself as a delivery man for the defendant. *Id.*, at *5. The court rejected Levy's argument and granted summary judgment on the administrative exemption, reasoning that "[b]oth the record and common sense support the notion that his primary task was to promote Remy and its spirits, not to serve as delivery man. Any manual work Levy undertook was directly related to his non-manual duties and merely facilitated the performance of his non-manual, promotional work." *Id.* (citing 29 C.F.R. § 541.703(a) ("'[D]irectly and closely related' work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly."). Consequently, the Eleventh Circuit summarily affirmed judgment for the defendant employer. *Levy v. Remy Cointreau USA, Inc.*, 604 F. App'x 918 (11th Cir. 2015).

In *Adams*, the Eleventh Circuit affirmed summary judgment for the defendant consulting company on the administrative exemption where the plaintiff testified she spent her time "running a project for one of [the employer's] clients, which entailed

creating project tasks, putting together a project plan, and ensuring the client's expectations were satisfied." *Adams*, 523 F. App'x at 660. The Eleventh Circuit noted that "Adams argues on appeal that she reported to [a supervisor] and 'followed his directions and orders explicitly,' but the evidence to which she cites does not support this assertion." *Id.* at 661.

Finally, in *Viola*, the Eleventh Circuit affirmed summary judgment and rejected the plaintiff's "attempts to create an issue of fact" as to the nature of her role at her employer, a health insurance provider. *Viola*, 441 F. App'x at 662. The court held that Viola's responsibilities of "marketing and promoting" her employer "in the local community . . . through networking with local organizations, organizing community events, and developing a marketing strategy for enrollment events" constituted "general management of business operations"—a conclusion based on a record "replete with evidence that Viola performed" exempt functions. *Id.* at 662-63. The Eleventh Circuit also rejected the plaintiff's argument that she "had virtually no ability to exercise discretion or independent judgment in matters of significance" because the record included indications that she often "worked alone," was required to "analyze her market," "wrote reports and business plans," and was "entrusted with ensuring that her marketing strategies complied with the myriad of complex federal regulations surrounding Medicare." *Id.* at 663-64.

The decisions in *Levy*, *Adams*, and *Viola* support summary judgment for ALS. Assuming that Garcia engaged in "hours and hours" of "basic tasks" like "data entry," these tasks—like the manual work performed by the plaintiff in *Levy*—arose from and

directly related to Garcia's exempt functions. As in *Adams*, Garcia's argument that she merely performed menial tasks and exclusively followed directions from supervisors finds no support in the record. It also contradicts her own testimony as well as documents showing that colleagues requested that she perform high-level tasks, and emails showing that others relied on and commended her work on such tasks. Finally, as the Eleventh Circuit concluded in *Viola*, there is substantial evidence that Garcia was asked to render independent advice to ALS management and to perform duties that required her to apply her experience and exercise her discretion. This record demonstrates that, pursuant to the governing regulations, Garcia undisputedly had authority to "interpret . . . operating practices" as to internal scoring of teacher and student performance, "commit[ed] the employer in matters that have significant financial impact" through her signature on the ACT contracts, and "investigate[d] and resolve[d] matters of significance on behalf of management" by researching and responding to questions posed by executives. *See* 29 C.F.R. § 541.202(b). That Garcia sometimes worked with templates provided by supervisors, sought and received assistance from external consultants, and used ALS's internal resources and publicly available information from relevant government entities in the course of her duties do not rebut the record evidence or create a triable issue as to the exemption's applicability.

In sum, Garcia's "baseless characterization of her duties is insufficient to overcome [ALS's] evidence that affirmatively establishes the administrative exemption's second prong" and the "very nature" of Garcia's activities "requires the exercise of independent discretion and judgment on matters of significance." *See Adams*, 523 F.

App'x at 660. Consequently, ALS is entitled to summary judgment on the administrative exemption.

## B. Learned Professional Exemption

ALS also argues that Garcia was exempt from the FLSA's overtime provision because she was a learned professional "employed in a bona fide . . . professional capacity." *See* 29 U.S.C. § 213(a)(1). Inasmuch as Garcia provides little in direct response to this argument, the Court agrees with ALS.

The governing regulations define an FLSA-exempt "learned professional" as one who is (1) compensated at a weekly salary of more than $455[17] per week and (2) whose primary duty is the performance of work "requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a). As noted previously, Garcia's $85,000 annual salary satisfies the first element, leaving only the second element for the Court's consideration. In assessing this second element, the Court again looks to the regulations, which provide that a qualifying individual must satisfy three requirements: (1) she "must perform work requiring advanced knowledge"; (2) the "advanced knowledge must be in a field of science or learning"; and (3) the "advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301.

Regarding the first requirement, Garcia's primary duty was to advise ALS and its management on topics related to the measurement of student and teacher performance

---

[17] Although implementation remains enjoined as discussed in note 16, *supra*, the Department of Labor's final rule raising the $455 threshold applies to the learned professional exemption as well.

at ALS schools. As discussed in Section III.A above, this work required advanced knowledge, which the regulations define as work "which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b).

As to the second requirement, Garcia possessed advanced knowledge in the areas of teaching and educational standards compliance. The regulations characterize these fields as "field[s] of science and learning" and distinguish such qualifying fields as "teaching . . . and other similar occupations" from "the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or leaning." 29 C.F.R. § 541.301(c).

Finally, Garcia fulfills the third requirement that her advanced knowledge be customarily acquired by a prolonged course of specialized intellectual instruction. The explanatory regulation provides:

> The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. However, the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction.

29 C.F.R. § 541.301(d). Garcia has a Bachelor's degree in professional administration, a Master's degree in educational leadership, various certifications from the Florida Department of Education, and a decade of experience in Miami-Dade County Public Schools.

28

In light of the foregoing, Garcia's role at ALS falls squarely within the learned professional exemption and summary judgment for ALS is appropriate on this basis. *See* 29 C.F.R. § 541.708 ("[W]ork that is exempt under one section of this part will not defeat the exemption under any other section."); *Tadili v. Ferber*, No. 12-80216-CIV, 2013 WL 12101132, at *2 (S.D. Fla. Nov. 22, 2013) (granting summary judgment on learned professional exemption where plaintiff was a master dental technician); *Pinillia v. Northwings Accessories Corp.*, No. 07-21564-CIV, 2007 WL 3378532, at *10 (S.D. Fla. Nov. 13, 2007) (granting summary judgment on learned professional exemption where plaintiff was a mechanical engineer).

## IV.   CONCLUSION

For the foregoing reasons, ALS's motion for summary judgment (DE 61) is **GRANTED**. All pending motions are **DENIED AS MOOT**. All hearings, deadlines, and trial settings are **CANCELED**. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter Judgment separately.

**DONE AND ORDERED** in chambers in Miami, Florida, this day of July, 2017.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE